van Gestel, J.
This matter is before the Court on a motion by the plaintiff, Cabot Corporation, through its Performance Materials Division (“CPM”), for partial summary judgment said to be on Counts I, II, III, IV and V of its complaint and on Counts I, II, III and IV of the defendants’ counterclaims.[1]
BACKGROUND
CPM is one of only a few significant suppliers of tantalum powder and wire (‘Tantalum Products”). Certain industry reports suggest that in the year 2000 CPM and one other company together shared in the production of approximately 90% of the world’s tantalum powder and mill products, and that CPM produced about 50% of the world’s total processed tantalum.
CPM holds patents on the process to produce tantalum flake powder, which can operate at higher voltages, and, therefore, no one else produces tantalum products that compete with CPM’s C-255 and C-275 product.
Tantalum Products are used in the production of high performance electronic capacitors.
The defendant AVX Corporation is one of the world’s largest manufacturers and seller of tantalum capacitors. Capacitors Eire passive components that are used in a wide range of modem electronic devices, including cellular telephones and personal computers. The other defendant, AVX Limited, is a wholly-owned subsidiaiy of AVX Corporation. A majority of AVX Corporation’s shares are owned by Kyocera Corporation, a Japanese conglomerate. Hereafter, unless necessary to distinguish otherwise, AVX Corporation and AVX Limited will be referred to as (“AVXj.
The shares of each of Cabot Corporation and AVX Corporation are publicly traded on the New York Stock Exchange, and each has annual sales of more than one billion dollars. These two companies are highly sophisticated in the business that is the subj ect of this litigation.
The matter involves the purchase by AVX, and the sale to it by CPM, of Tantalum Products.
Tantalum is an elemental metal (chemical symbol Ta,” atomic number 73) that is approximately as rare in nature as uranium. Tantalum is extremely resistant to corrosion, is highly ductile, and has ahigh dielectric constant across a broad range of temperatures. Consequently, tantalum is a preferred raw material for high performance electronic capacitors.
Historically, the market for tantalum has been highly volatile. Periods of high demand, intermittent supply shortages, inventory hoarding, and sharply rising prices have been followed by recurring episodes of reduced demand, over-production, large customer inventories and rapidly falling prices. Although prices of other industrial metals frequently parallel general economic cycles, the relative scarcity of tantalum and its historical susceptibility to supply shortages have caused fluctuations in the price of tantalum to be much more pronounced than those of other industrial metals.
CPM and AVX have a history with each other in purchasing and selling tantalum that goes back for many years. They each understand the peculiar nature of the industry, its fluctuations, and the essence of how products sold by CPM to AVX are manufactured, and the timing thereof.
CPM has been one of four suppliers of Tantalum Products to AVX. Immediately prior to the events that are at issue in this case, CPM was supplying approximately 20% of AVXs total tantalum needs.
In the years prior to 2001, AVX and CPM typically executed one- or two-page “Letters of Intent,” which described the annual quantities of Tantalum Products that AVX then anticipated buying from CPM, and the prices that AVX then was willing to pay CPM for those products. These Letters of Intent were simple good faith estimates of AVXs anticipated needs that did not bind AVX to make actual purchases from CPM. In fact, AVX refers to them as requirements contracts, mean *37 ing that it only will buy from CPM what it needs of Tantalum Products, presumably up to the amounts stated in the letters. The letters were designed to assist CPM in its production planning. In practice, AVX’s actual purchases frequently varied from the amounts stated in the Letters of Intent. As a result, CPM experienced significant fluctuations in its sales of Tantalum Products to AVX.
Over a period of years prior to mid-2000, CPM attempted to convince AVX to enter into binding, long-term supply agreements for Tantalum Products, but AVX declined to do so.
In January 2000, AVX and CPM signed two Letters of Intent, one relating to tantalum powder and the other relating to tantalum wire. In these letters, AVX stated its “intention to purchase” certain quantities of Tantalum Products from CPM in 2000 and 2001 (the “2000 Letters of Intent”).
During the year 2000, demand for tantalum capacitors experienced a period of unprecedented growth. Orders from some of AVXs customers increased by more than 200%. By the summer of 2000, a tantalum shortage had become evident. Because supplies of tantalum ore, and the production capacity of the manufacturers of tantalum powder and wire, are limited in the short run, the supply of Tantalum Products could not keep pace with the sharply-rising demand for tantalum capacitors. As a result, AVX was not able to procure from its Tantalum Product suppliers the quantity of Tantalum Products that it needed to keep up with the demand for tantalum capacitors. As shortages occurred, the price of Tantalum Products rose.
In August 2000, CPM informed its customers that, beginning in 2001, it would allocate scarce Tantalum Products to those customers who were prepared to enter into binding, long-term contracts with CPM. Letters announcing CPM’s decision were distributed to all of its major customers, including AVX.
Between August and November 2000, AVX and CPM engaged in negotiations with respect to a contract that would govern the parties’ future relationship. Their respective representatives made proposals and counter -proposals.
In the course of these negotiations, a dispute arose as to whether CPM was bound by the 2000 Letters of Intent to supply Tantalum Product to AVX until the end of 2001. AVX insisted CPM was bound and CPM asserted that the 2000 Letters of Intent were not binding.
In early November 2000, the parties reached tentative agreement on the material terms of a five-year contract. Those terms were memorialized in an e-mail message dated November 7, 2000, from John Gilbert-son (“Gilbertson”), President of AVX Corporation, to Thomas H. Odie (“Odie”), Vice President and General Manager of CPM. Gilbertson closed his e-mail, “TOM ... I think we have a fair agreement for both parties . . . hope you agree.”
Consistent with their negotiations, in January 2001, AVX and CPM executed a written supply agreement (the “2001 Supply Agreement”). The 2001 Supply Agreement obligated AVX to buy, and CPM to sell, specified quantities of tantalum powder, wire and a precursor product called “K2TaF7" over a five-year period, at prices set forth in the agreement. Other provisions of the 2001 Supply Agreement address ordering procedures, payment terms, AVXs right to price reductions if CPM were to sell Tantalum Products to AVXs competitors at prices below those stated in the agreement, AVXs right to purchase a share of product resulting from a capacity expansion by CPM, product warranties, scrap purchases and a variety of other issues.
AVX contends that the CPM announcement about needing long-term contracts to insure a supply of tantalum was a conscious exercise of economic coercion by CPM. AVX claims nowalthough it did not thenthat it entered into the negotiations with CPM and executed the 2001 Supply Agreement in January 2001, solely because it was facing termination of the supply of a critical manufacturing product which could not be replaced and therefore it had no other choice.
AVX asserts that CPM, during the negotiations leading up to the 2001 Supply Agreement, constantly claimed that CPM had already sold all of its available tantalum powder. This, AVX claims, was untrue and fraudulent.
Section 10 of the 2001 Supply Agreement reads as follows:
This Agreement constitutes the entire understanding of the parties and supersede [s] all prior purchase orders . . . discussions, agreements and letters of intent between the parties, including without limitation, AVX purchase orders listed on Appendix A and the existing Letters of Intent between CPM and AVX respecting tantalum wire and tantalum powder (individually and collectively the “Prior Agreements”) all of which shall have no force and effect and shall create no liabilities or obligations for either party or any affiliate of either party. This Agreement also constitutes full accord and satisfaction between Buyer and CPM with respect to the Prior Agreements. Buyer and CPM hereby each release each other from any and all claims and causes of action relating to, or arising under, the Prior Agreements that Buyer and CPM may now or hereafter have.
By a letter dated November 12, 2001, the parties agreed to modify the 2001 Supply Agreement in certain respects. In pertinent part, the letter reads:
I am writing to make a specific request of Cabot. The contract [the 2001 Supply Agreement] specifies *38 that AVX Biddeford will take from you 5,000 pounds of “as available” product in calendar year 2001. The contract was executed during a period of exceptional demand for tantalum capacitors, and the intent of this clause was to allow AVX to obtain extra powder to service our customers. As you well know, at this time and for the forseeable future, we have absolutely no use for this tantalum powder. This $2.5 million purchase will only result in further degradation of our financial health. We request that Cabot excuse this portion of our contract.
In late 2001, CPM had difficulty supplying the full amount of a particular type of tantalum powder (called C-275) that was stated in the 2001 Supply Agreement. At CPM’s request, AVX agreed to reduce the amount of C-275 powder that CPM would have to deliver in 2002.
On July 26, 2002, AVX commenced litigation against CPM in the Federal Court asserting claims under the prior 2000 Letters of Intent and alleging that the 2001 Supply Agreement was void because it had been executed under economic duress. This was the first time since the execution of the 2001 Supply Agreement that AVX made any claim that it was executed under duress of any kind. The Federal action was dismissed for lack of diversity of citizenship. CPM then commenced this declaratory judgment action.
AVX and CPM performed under the 2001 Supply Agreement both before and after the onset of litigation. From January 2001, to the commencement of litigation in July 2002, AVX purchased more than $173,000,000 of Tantalum Products from CPM in 469 separate transactions, at the prices, on the terms, and in the amounts, specified in the 2001 Supply Agreement. After the onset of litigation, AVX continued to purchase Tantalum Products from CPM. As of October 2003, AVX had purchased more than $342,809,077.50 of Tantalum Products in 739 separate transactions under the 2001 Supply Agreement. Over the same period, AVX had sold to CPM $5,263,271 of tantalum scrap in 18 separate transactions, also in compliance with the 2001 Supply Agreement.
DISCUSSION
Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Opara v. Massachusetts Life Insurance Company, 441 Mass. 539, 544 (2004); Lindsay v. Romano, 427 Mass. 771, 773 (1998); Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 283 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
Before stating its conclusions, this Court pauses to observe that the parties in this case are extremely sophisticated, all certainly had constant advice and assistance from highly competent counsel, and all benefitted from their prior experience with the purchase and sale of Tantalum Products over many years. These sophisticated parties negotiated and chose specific language to state their intentions in the 2001 Supply Agreement. Here, there was no disparity in bargaining power or lack of sophistication about the matter at hand. Where knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document, negotiated over several months, they are entitled to and should be held to.the language they chose.
The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four comers of the instrument that are specifically anticipated and addressed therein overwhelm or change the document itself. “(A]greements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.” Freedman v. Walsh, 331 Mass. 401, 406 (1954). Once again, this is not a time for the Court to attempt to be smarter than the parties.
The basic defense of AVX to the viability or binding nature of the 2001 Supply Agreement is that it was signed under economic duress.
A [contract] signed under duress is not binding . . . “Coercion sufficient to avoid a contract need not, of course, consist of physical force or threats of it. Social or economic pressure illegally or immorally applied may be sufficient.” . . .
To show economic duress (1) a party “must show that he has been the victim of wrongful or unlawful act or threat, and (2) such act or threat must be one which deprives the victim of his unfettered will.”... “As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values” . . .
The elements of economic duress have also been described as follows:
“(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party.” . . . “Merely taking advantage of another’s financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion" . . . Thus “[i]n order to substantiate the allegation of economic distress or business compulsion . . . [t]here must be a showing of acts on the part of the [opposite party] which produced [the financial embarrassment]. The assertion of duress must be proved by evidence that the duress resulted from the [opposite party’s] wrongful and *39 oppressive conduct and not by [the oppressed party’s] necessities” . . .
International Underwater Contractors, Inc. v. New England Tel & Tel Co., 8 Mass.App.Ct. 340, 342 (1979). See also Ismert and Associates, Inc. v. New England Mutual Life Insurance Company, 801 F.2d 536, 548-49 (1st Cir. 1986); W.R. Grimshaw Co. v. Nevil C. Withrow Co., 248 F.2d 896, 904 (8th Cir. 1957).
Not infrequently, when two commercial parties enter into an agreement, one of them has a decided economic advantage over the other.' The weaker party often must enter into the bargain because of his economic disadvantage, or some combination of the two.
Because an element of economic duress is thus present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases. Otherwise, the stronger party to a contract or release would routinely be at risk of having its rights under the [resulting] contract or release challenged long after the instrument became effective.
VKK Corp. v. National Football League, 244 F.3d 114, 123 (2d Cir. 2001).
This is not one of those “extreme and extraordinary cases.” AVX is a multi-billion dollar business corporation, majority-owned by a Japanese conglomerate. Its tantalum capacitor business is conducted in one of seven operating divisions. At the relevant time, CPM supplied only about 20% of the Tantalum Products consumed in the tantalum capacitor segment of AVXs business. The 2001 Supply Agreement was negotiated and executed by senior executives, with advice of counsel, over a nearly six-month period.
There is no serious question as to whether the 2001 Supply Agreement was entered into under duress. AVX certainly did not start out with that view. It signalled its acceptance of the fairness of the 2001 Supply Agreement as early as November 7, 2000, when Gilbertson, AVXs President, said in his e-mail to Odie, Vice President and General Manager of CPM, “TOM ... I think we have a fair agreement for both parties . . . hope you agree.”
It is clear that CPM did not commit or make any “unlawful” act or threat; and it is doubtful that CPM’s hard bargaining fits within the concept of a “wrongful act” as that phrase is used among the elements of economic duress.
More specifically, AVX did not “make a disproportionate exchange of values.” In an admittedly volatile market, AVX ended up with a long-term contract for the purchase of tantalum, at a given price, with a “most favored nation” clause regarding sales to its competition, along with a number of additional contractual benefits to it. There is no showing that the quantity of product to be purchased was not what AVX desired or that the prices therefor were out of line in the marketplace for tantalum at the time.
Nor is there any evidenceaside from Gilbertson’s claim to that effect, which is not proof of anythingthat AVX had no other alternative. AVX presumably could have made purchases of tantalum from CPM’s competitors if CPM was being untruthful when it said there was a shortage of product. And AVX certainly could have gone immediately to some appropriate court and sought preliminary injunctive relief,[2] followed by declaratory relief on the merits. See, e.g., Ismert and Associates, Inc., supra 801 F.2d at 548-49.
In the very first paragraph of its counterclaims, AVX said:
Plaintiffs [AVX] and defendant [CPM] had a contract for the supply of tantalum. Despite that agreement, when the market for tantalum went from relatively stable to extremely volatile, [CPM], one of the largest companies in the market, took advantage of its strong position and [AVXs] weakened position to force [AVX] into a new, highly unfavorable set of terms for the supply of the tantalum that [CPM] had already contracted to supply.
To the extent the foregoing allegations are factual, they are binding on AVX. G.L.c. 231, Sec. 87. Thus, AVXs own words reveal that its “weakened position” came about by reason of factors in the marketplace that gave CPM a stronger bargaining posture over AVX. It was not, however, a situation created by CPM. Rather, CPM simply took advantage of the marketplace and AVXs economic disadvantage.
Additionally, AVXs “financial embarrassment” is hardly apparent on the summary judgment record. Nor is it shown to have been “produced” by CPM, rather than the state of the world-wide tantalum market.
It is well settled that “[a] contract or release, the execution of which is induced by duress, is voidable, not void, and the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so.” Hogan v. Eastern Enterprises/Boston Gas, 165 F.Sup.2d 55, 62 (D.Mass. 2001). “One who wishes to repudiate a contract on grounds that it was obtained under duress must do so within a reasonable time.” Dorn v. Astra USA, 975 F.Sup. 388, 394 (D.Mass. 1997).
Still further, “[a] party may ratify a contract or release entered into under duress by ‘intentionally accepting benefits under the contract,’ by ‘remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it,’ or by ‘acting upon it, performing under it, or affirmatively acknowledging it.’ ” VKK Corp., supra 244 F.3d at 123 (citing In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989)).
AVX ratified the 2001 Supply Agreement: when it executed the agreement without protest in January *40 2001; again when it performed under the agreement at least through October 2003, intentionally accepting the benefits thereof; yet again when it affirmatively acknowledged the agreement in its November 12, 2001, letter regarding the request for a modification to become excused from certain tantalum powder purchase requirements; and further when it remained wholly silent about any deficiency in the agreement until it filed its Federal Court lawsuit on July 26,2002, nearly 18 months after signing, which to this Court is, as a matter of law, an unreasonable delay.
The 2001 Supply Agreement is not voidable for economic duress. Thus, the release contained therein in Section 10 applies with full force. “Massachusetts law favors the enforcement of releases.” Sharon v. City of Newton, 437 Mass. 99, 105 (2002).
With appropriate bracketed modifications, the release produces the following result:
Th[e 2001 Supply] Agreement constitutes the entire understanding of the parties and supersedes] all prior purchase orders .. . discussions, agreements and letters of intent between the parties, including without limitation, AVX purchase orders listed on Appendix A [to the agreement] and the existing Letters of Intent between CPM and AVX respecting tantalum wire and tantalum powder (individually and collectively the “Prior Agreements”) all of which shall have no force and effect and shall create no liabilities or obligations for either party or any affiliate of either party. Th[e 2001 Supply] Agreement also constitutes full accord and satisfaction between [AVX] and CPM with respect to the Prior Agreements. [AVX] and CPM [tjhereby each release [d] each other from any and all claims and causes of action relating to, or arising under, the Prior Agreements that [AVX] and CPM may now or hereafter have.
These sophisticated buyers and sellers of Tantalum Products knew exactly what those words meant when they entered into the 2001 Supply Agreement without protest, and while they acted pursuant thereto for at least 18 months, again without protest. It “is not the role of the [C]ourt to alter the parties’ agreement.” Rogaris v. Albert 431 Mass. 833, 835 (2000). They must live by the words they selected.
ORDER
For the foregoing reasons, the Plaintiff Cabot Corporation’s Motion for Partial Summary Judgment (Paper #11), is ALLOWED. Appropriate declarations will be included in the final judgment.

The motion says that it relates only to Counts I through V of the complaint and Counts I through IV of the counterclaims. The complaint, however, has counts running through Count VI and the counterclaims have counts running through Count V. What is to become of those counts? Further, the plaintiffs statement of undisputed facts makes specific reference to counts in the counterclaims, including Count V. Why mention Count V? Additionally, the counterclaims, as filed, purport to have Exhibits A through H attached; but, as too often happens, what actually was filed includes no exhibits. The Court is left somewhat unclear by the parties’ filings, but it will do its best to respond to the motion, arguments and briefings provided.

Both this Court and the Federal Court grant such relief, usually within 10 days or less of filing a complaint, if the applicant demonstrates its likelihood of success on the merits, that it will suffer irreparable harm if the injunctive relief sought is not granted, and that its harm, without the injunction, outweighs any harm to the opposite party from being enjoined. GTE Products Corp. v. Stewart 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). Indeed, if AVX could not establish the criteria for a preliminary injunction it would seem hard-pressed to show economic duress.